United States District Court
Southern District of Texas
**ENTERED**
June 10, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| CHERYL WELLS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 6:20-CV-00014 |
| | § | |
| ANDREW M. SAUL, | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM AND RECOMMENDATION</u>

Plaintiff Cheryl Wells filed this action pursuant to 42 U.S.C. § 405(g) to review the decision of the Commissioner of Social Security ("the Commissioner") to deny her application for Social Security disability benefits. Now pending are Wells's and the Commissioner's cross-motions for summary judgment (D.E. 14, 15, 18). Wells first contends that the Administrative Law Judge ("ALJ") failed to include all of her mental limitations in the hypothetical asked to the vocational expert and the ultimate residual functional capacity ("RFC") determination. Second, she challenges the ALJ's RFC determination to the extent the ALJ concluded that she could complete semi-skilled work despite having severe depression and panic disorder. Finally, Wells asserts that the ALJ did not conduct the proper analysis at stage five because she did not make a finding that Wells could move to other jobs with little vocational adjustment. For the reasons discussed further below, it is respectfully recommended that Wells's motion (D.E. 14) be denied, the Commissioner's motion (D.E. 18) be granted, and Wells's cause of action be dismissed.

## I.   JURISDICTION

This Court has jurisdiction under 42 U.S.C. § 405(g) to review a final decision of the Commissioner of Social Security and venue is appropriate because Wells resides in Victoria County, Texas.  42 U.S.C. § 405(g); 28 U.S.C. § 124(b)(5).

## II.   BACKGROUND & ADMINISTRATIVE RECORD

### a.  Application and Hearing

In March 2014, Wells filed an application for disability insurance benefits, alleging a disability commencing on November 30, 2013.  (D.E. 10-7 at 3-6).[1]  Wells claimed that her osteoarthritis, Type 2 diabetes, fibromyalgia, knee surgery with continuing problems, high blood pressure, high cholesterol, sleep apnea, depression, and anxiety limited her ability to work.  (*Id.* at 6).  The Commissioner denied Wells's application both initially and on reconsideration.  (D.E. 10-4 at 13, 27).

In the Disability Determination Explanation at the initial stage, state medical consultant Dr. Matthew Wong concluded when analyzing the Paragraph B criteria of the Listings that Wells had only mild restrictions as a result of her affective disorders and anxiety disorders.  (*Id.* at 6-7).  He also concluded that these disorders were non-severe.  (*Id.* at 6).  In the Disability Determination Explanation at the reconsideration stage, state medical consultant Dr. Richard Alexander reached the same conclusions.  (*Id.* at 19-21).

---

[1] Wells initially alleged that her disability commenced on November 1, 2013, but this was later changed to November 30.

Following a hearing, the ALJ concluded that Wells had not been under a disability since November 30, 2013. (D.E. 10-3 at 28). The Appeals Council denied Wells's request for review of the ALJ's decision. (*Id.* at 2-5). However, Wells successfully sought review by the District Court, which vacated the Commissioner's finding that Wells was not disabled and remanded the case for a reassessment of the evidence regarding Wells's residual functional capacity and her ability to return to her past relevant work. (D.E. 10-16 at 10).

At the post-remand hearing before the ALJ on November 11, 2019, Wells testified to the following. She had a previous job as a sales assistant where she located bridges that needed repair, analyzed the blueprints of the bridges, and then created a price quote on the repairs. (D.E. 10-15 at 8). In another previous job, she was a sales representative for a newspaper and sought advertisers. (*Id.* at 9). In another job, she sold advertising for a cable company. (*Id.* at 10). Wells extensively discussed her physical impairments. (*Id.* at 13-19). She had three or four panic attacks a week due to her anxiety. (*Id.* at 19-20). They lasted around 30 minutes. (*Id.* at 20). She did not like being around large crowds for a long period of time. She also had a lot of stress at home because her husband had a serious mental illness. She had trouble concentrating due to brain fog, extreme tiredness, and memory problems. (*Id.*). Due to all of her impairments, she was able to, for example, walk the dog and cook a short meal during a single day, but not go to the store or do any other activity. (*Id.* at 22). Anything more would cause pain. (*Id.* at 23). Her depression was also terrible during this time and made her feel like not doing anything. (*Id.*). She would isolate herself for two to three days, and she cried daily. (*Id.* at 24).

3

A vocational expert identified Wells's past relevant work as administrative assistant and general salesperson. (*Id.* at 26, 28-29). The ALJ asked the vocational expert whether a hypothetical person with the same age, education, and work experience as Wells could perform her past relevant work if they also: (1) could only perform sedentary work; (2) could stand, walk for three hours out of an eight-hour day and for 45 minutes continuously, sit for six hours out of an eight-hour day and for two hours continuously, occasionally push and pull with her bilateral lower extremities, occasionally balance, crawl, crouch, kneel, stoop and climb ramps or stairs, but never climb ladders, ropes, or scaffolds; (3) could not have any workplace hazards such as unprotected moving machinery or any vibrations; and (4) could understand, carry out, and remember detailed but not complex instructions. (*Id.* at 29-30). The vocational expert testified that this person could not perform Wells's past relevant work. (*Id.* at 30). However, she would have transferable skills in clerical skills such as use of a computer, doing reports, and recording data. (*Id.*). Those skills would transfer to such jobs as claims clerk, diet clerk, and credit card clerk and would require very little vocational adjustment. (*Id.* at 30-31). In response to additional questions from Wells's attorney, the vocational expert testified that a person who missed four days of work every month would not be able to maintain employment, nor would someone who could only stand for 30 minutes at a time or sit for one hour at a time. (*Id.* at 31-32).

### b.  *Medical Records*

In a function report dated May 12, 2014, Wells indicated the following. (D.E. 10-8 at 16-23). She had constant pain due to her fibromyalgia and arthritis. (*Id.* at 16). The

4

previous year, she had fallen asleep at work and had to take several days off in a row due to her pain.  Her conditions also caused her to have depression and anxiety, which made it difficult for her to focus.  Her medication also made her confused and forgetful.  (*Id.*).  On a normal day, she would take a shower, eat, take her medicine, make phone calls, sometimes get dressed, and sometimes have physical therapy in the pool for her arthritis. (*Id.* at 17).  She had a dog that she fed.  Her daughter helped with chores when she was able to.  Wells found it difficult to put on pants and shoes, did not shave anymore, could only use the toilet slowly, and did not cook much anymore because it hurt to stand in one place.  However, she had no problems bathing, caring for her hair, or feeding herself.  (*Id.*). She prepared her own meals including microwaving vegetables, making sandwiches, and sometimes making a bigger meal when she felt better.  (*Id.* at 18).  She did laundry and dusted once a week, but could not do any outdoor chores.  (*Id.*).  She was able to drive a car and could go out alone.  (*Id.* at 19).  She shopped once a week in stores and by computer. She was able to pay her own bills, handle a savings account, and use a checkbook, but could not count change due to her swollen hands.  (*Id.*).  She liked reading and watching TV, but she could not sit in one place for very long and had to get up and move around. (*Id.* at 20).  She played board games with her grandchildren and went to her daughter's house every couple of weeks.  (*Id.*).  She did not have trouble getting along with people. (*Id.* at 21).  Her conditions affected her ability to complete tasks, concentrate, remember, understand, and follow instructions.  Her medication made her feel foggy.  (*Id.*).  She could not handle stress because it caused panic attacks.  (*Id.* at 22).

On June 23, 2014, Dr. Sandy Caldwell-Harper, a psychologist, completed an evaluation of Wells. (D.E. 10-10 at 54-57). Wells reported that her symptoms worsened one year earlier and that she was falling asleep during the day and could not work. (*Id.* at 54-55). Wells reported that she completed her own hygiene responsibilities, did some chores like washing dishes, and cooked twice a week, but she was also afraid of falling at times and had lost interest in cooking. (*Id.* at 55). She went to the grocery store with her husband. Other limitations to her activities of daily living were due to physical impairments. (*Id.*). She reported having panic attacks once a month. (*Id.* at 56). Dr. Caldwell-Harper concluded that Wells's thought processes appeared intact, there was no impairment to her self-perception, her judgment and insight were intact, her remote and recent memory skills were intact, and her concentration skills were intact, while her immediate memory skills were only somewhat intact. (*Id.* at 56-57).

In a function report dated August 12, 2014, Wells indicated the following. (D.E. 10-8 at 46-53). She was in the hospital a few months earlier due to a panic attack. (*Id.* at 46). She also had a few panic attacks at her previous job. (*Id.*). She did not dress to go out, could only take showers, was only able to wash her hair rather than style it, could not shave, and could only cook easy meals that she could microwave for the most part. (Id at 47). She had difficulty remembering to take care of personal needs and to take medication, but she wrote them down to help. (*Id.* at 48). She sometimes made her own meals as long as they did not require much preparation. She dusted a couple of times a month and her husband did laundry. When her daughter came over to clean, she helped. (*Id.*). She was able to drive and go out alone. (*Id.* at 49). Her daughter did her grocery shopping. (*Id.*).

6

She liked to read, watch TV, go to the pool, and visit with her grandchildren.  (*Id.* at 50).

She no longer had a social life, but went to the pool by herself or with her daughter and

grandchildren one to two times a week.  (*Id.*).  She did not have any problems getting along

with people, but her depression and pain caused her to not seek out new friends or social

activities.  (*Id.* at 51).  Her memory was worse because she felt foggy.  She could follow

written instructions, but only slowly.  (*Id.*).  She did not handle stress well.  (*Id.* at 52).

On November 5, 2014, Dr. Jonathan Ridenour, a licensed psychologist, wrote a

letter to Wells's medical doctor requesting that he prescribe her additional Klonopin to take

when she was having a panic attack.  (D.E. 10-10 at 61).  He also noted that Wells had

"weaned herself off the Wellbutrin at her own discretion as she reports it was not helpful.

She would like to try Cymbalta, which I believe may help with her depression."  (*Id.*).

On March 25, 2015, Dr. Kathryn Wortz, a psychologist, briefly met with Wells.

(D.E. 10-13 at 88).  They discussed her prescriptions.  Wells reported that she had feelings

that she wanted to hurt herself the previous weekend, but did not have any plan or intent

and did not feel that way anymore.  She reported that she had been on a "downward spiral"

for four weeks and had been crying often.  She indicated that she would be interested in

resuming seeing a mental health counselor.  (*Id.*).

On April 21, 2015, Dr. Wortz met with Wells for psychotherapy.  (*Id.* at 85).  Her

attention and concentration were intact, and her thought process was linear and goal-

oriented.  Wells felt that her new prescription for duloxetine was working well because she

had not had a panic attack since starting it.  Her prescription for Atarax was also helping

her anxiety.  She reported that she began having panic attacks two years earlier when she

was laid off.  She also discussed her marriage history and problems during her childhood.
Based on Wells's complaints of depressed mood, irritability, poor concentration,
hopelessness and helplessness, fatigue, and low self-esteem, Dr. Wortz diagnosed her with
persistent depressive disorder.  She concluded that continued psychotherapy for four
months would benefit Wells, who had adequate insight and judgment.  Wells was also to
continue taking duloxetine.  (*Id.*).

On May 27, 2015, Dr. Wortz met with Wells for psychotherapy.  (*Id.* at 68).  Her
attention and concentration were intact, and her thought process was linear and goal-
oriented.  She discussed her marriage history and problems during her childhood.  Dr.
Wortz concluded that continued psychotherapy would benefit Wells, who had adequate
insight and judgment.  Wells was also to continue taking duloxetine.  (*Id.*).

On August 13, 2015, Dr. Wortz met with Wells for psychotherapy.  (*Id.* at 60).  Her
attention and concentration were intact, and her thought process was linear and goal-
oriented.  She was unhappy with her husband.  Dr. Wortz concluded that continued
psychotherapy would benefit Wells, who had adequate insight and judgment.  Wells was
also to continue taking duloxetine.  (*Id.*).

On October 6, 2015, Dr. Wortz met with Wells for psychotherapy.  (*Id.* at 47).  Her
attention and concentration were intact, and her thought process was linear and goal-
oriented.  She was not cooking or going out, and was stressed by her husband's daughter
staying with them.  Her husband's schizoaffective disorder made her feel alone, and she
was hoping to separate from him.  The pain from her fibromyalgia was making her
depression worse.  Dr. Wortz concluded that continued psychotherapy would benefit

Wells, who had adequate insight and judgment.  Wells was also to continue taking duloxetine.  (*Id.*).

On October 20, 2015, Dr. Wortz met with Wells for psychotherapy.  (*Id.* at 45). Wells reported that she had separated from her husband and was pleased about it.  Dr. Wortz concluded that continued psychotherapy would benefit Wells, who had adequate insight and judgment.  Wells was also to continue taking duloxetine.  (*Id.*).

Medical records from December 4, 2015, indicated that Wells reported that her depression was much worse.  (*Id.* at 40).  She had missed a few days of taking Cymbalta. She did not want to do anything and had not left the house for six weeks.  She was unable to keep her appointments with a psychologist because she could not afford them.  (*Id.*). The assessment indicated that her depression symptoms were poorly controlled and a referral was made to meet with psychology interns.  (*Id.* at 43).  Her insomnia was also suspected to be secondary to her poorly controlled depression and anxiety.  (*Id.*).

On February 18, 2016, Dr. Paul Andrews completed a medical source statement where he indicated that Wells had: (1) no limitation in her ability to carry out simple instructions; (2) mild limitations in her ability to understand and remember simple instructions, make judgments on simple work-related decisions, understand and remember complex instructions, and carry out complex instructions; and (3) a moderate limitation in her ability to make judgments on complex work-related decisions.  (*Id.* at 92).  Dr. Andrews noted that Wells had difficulty remembering instructions, but could carry out simple instructions with repetition and had more difficulty with complex instructions.  (*Id.*).  Dr. Andrews further indicated that Wells had: (1) mild limitations in her ability to interact

appropriately with the public, supervisors, and co-workers; and (2) a moderate limitation in her ability to respond appropriately to usual work situations and to changes in a routine work setting.  (*Id.* at 93).

In a written psychological assessment report, Dr. Andrews noted that Wells reported that she avoided driving due to pain in her hands, had a bank account and managed her own finances, could shop but was anxious in crowds, and did a few household chores.  (*Id.* at 96).  She also reported that she was living with her husband and that they got along very well.  Wells was "very verbal and gave more information than was necessary in answering questions."  She became teary when discussing her history. She reported symptoms of amotivation, crying, and feeling helpless, and that she had problems with memory and loss of focus.  She had an IQ score of 84, which was in the low average range.  (*Id.*).

On June 11, 2019, Dr. Seema Malani completed a medical source statement indicating that Wells had depression and anxiety.  (D.E. 10-32 at 77).  These, along with her physical impairments, would frequently interfere with her attention and concentration. Due to her severe anxiety, she was incapable of even low stress jobs, and she was likely to miss more than four days of work a month due to her impairments.  (*Id.*).

On September 27, 2019, Dr. John van Metre completed a medical source statement indicating that Wells had depression and anxiety.  (*Id.* at 83).  These, along with her physical impairments, would frequently interfere with her attention and concentration.  Due to her severe anxiety, she was incapable of even low stress jobs, and she was likely to miss more than four days of work a month due to her impairments.  (*Id.*).

### c.   *ALJ Decision*

On December 31, 2019, the ALJ issued an opinion, concluding that Wells was not under a disability since November 1, 2013.  (D.E. 10-14 at 5-23).  At the first step of the sequential evaluation process, the ALJ concluded that Wells had not engaged in substantial gainful activity from the alleged onset date of November 1, 2013, through her date last insured of March 31, 2018.  (*Id.* at 8).

At the second step, the ALJ concluded that Wells had several severe impairments that limited her ability to perform basic work activities, including: osteoarthritis of bilateral knees, fibromyalgia, degenerative changes at L5-S1 with posterior osteophyte formation and degenerative changes involving the lower facet joints, morbid obesity, persistent depressive disorder, and panic disorder.  (*Id.* at 8).

At the third step, the ALJ concluded that Wells did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.  (*Id.* at 8-10).  Specifically as to Wells's mental impairments, the ALJ noted that, in order to meet the Paragraph B criteria, the mental impairments must result in at least one extreme limitation or two marked limitations in a broad area of functioning.  (*Id.* at 9).  The ALJ found that Wells had a moderate limitation in concentrating, persisting, or maintaining pace, but only mild limitations in: (1) understanding, remembering, or applying information; (2) interacting with others; and (3) adapting or managing herself.  (*Id.* at 9-10).  The ALJ noted that the Paragraph B criteria were not the same as the RFC determination, which only applied to steps four and five of the sequential evaluation.  (*Id.* at 10).

11

The ALJ concluded that Wells had the residual functional capacity ("RFC") to perform sedentary work, with various additional physical limitations. (*Id.*). The ALJ also noted that Wells could "understand, carry out and remember detailed but not complex instructions." (*Id.*).

In reaching this conclusion, the ALJ found that Wells's medically determinable impairments could be expected to cause the symptoms that Wells alleged, but that her statements regarding the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the medical and other evidence in the record. (*Id.* at 11, 16). The ALJ afforded little weight to the state agency psychological consultants' opinions that Wells had only non-severe mental impairments, concluding that the medical evidence established that the mental impairments caused more than a minimal effect on Wells's ability to engage in work-related activity. (*Id.* at 19).

The ALJ afforded significant weight to Dr. Andrews's medical source statement, however, and found that his opinions were consistent with the limited medical evidence of mental health symptoms. (*Id.* at 20). The ALJ stated that "[t]he evidence illustrates that the claimant is able [to] make satisfactory judgments on detailed but not complex instructions and complex work tasks, and satisfactorily deal with complex work stress as evidenced by her reported activities of daily living," including the fact that she prepared her own meals, managed her own money, drove, followed television plots, used a computer, and played board games. (*Id.*).

At step four, the ALJ concluded that, based on her RFC, Wells was unable to perform any past relevant work. (*Id.* at 21). However, at step five, the ALJ concluded that,

12

based on her RFC, age, education, and work experience, Wells had acquired work skills from past relevant work that were transferable to other occupations that existed in significant numbers in the national economy. (*Id.* at 22). Specifically, the ALJ identified the jobs of claims clerk, diet clerk, and credit card clerk as occupations that Wells could perform, all of which were sedentary and semi-skilled. (*Id.*). Thus, the ALJ concluded that Wells was not under a disability between November 1, 2013, and March 31, 2018. (*Id.* at 23).

The Appeals Council denied Wells's request for review of the ALJ's decision. (*Id.* at 2-4).

## III. DISCUSSION

   a. *Whether the ALJ erred by failing to include all of Wells's established mental limitations in the RFC determination and hypothetical question posed to the vocational expert*

In her motion for summary judgment, Wells contends that the ALJ erred by failing to include all limitations identified by Dr. Andrews in the hypothetical to the vocational expert and final RFC determination, despite the fact that he ALJ gave significant weight to Dr. Andrews's opinion. (D.E. 15 at 7). She argues that, once the ALJ accepted Dr. Andrews's opinion and gave it significant weight, he was required to either include the limitations or explain why he rejected certain parts. (*Id.* at 8). In particular, Wells points to the ALJ's conclusion that she could understand, remember, and carry out detailed (but not complex) instructions, despite Dr. Andrews's conclusion that she had difficulty remembering instructions, particularly complex ones. (*Id.* at 9). Wells argues that the

ALJ's reliance on her activities of daily living to downplay Dr. Andrews's conclusions is misplaced.  (*Id.* at 9-10).

The Commissioner responds that the ALJ properly weighed the medical opinion evidence and that it was the ALJ's responsibility to determine Wells's RFC.  (D.E. 18 at 6-7).  The Commissioner contends that Wells addresses part of Dr. Andrews's conclusions, but ignores that he also indicated that she had only a mild limitation in understanding and remembering even complex instructions.  (*Id.* at 7-8).  The Commissioner argues that Dr. Andrews was not a treating physician and that the ALJ adequately explained her consideration of his opinion in the context of the other evidence in the record.  (*Id.* at 8-10).  Finally, the Commissioner asserts that the hypothetical given to the vocational expert included every limitation accepted as true by the ALJ and was not deficient.  (*Id.* at 10-11).

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards.  *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*  The burden has been described as more than a scintilla, but lower than a preponderance.  *Id.*

In evaluating a disability claim, the Commissioner follows a five-step sequential process to determine whether: (1) the claimant is participating in substantial gainful activity; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the

14

appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform other relevant work. *Martinez v. Chater*, 64 F.3d 172, 173-174 (5th Cir. 1995); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof on the first four steps, with the burden shifting to the Commissioner at the fifth step. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

If the ALJ finds that a claimant has a severe mental impairment that does not meet or equal an impairment listed in the appendix to the regulations, the analysis then moves to an RFC assessment. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3). Thus, before going from step three to step four, the ALJ assesses a claimant's RFC. *Perez*, 415 F.3d at 461. RFC "is a determination of the most the claimant can still do despite [her] physical and mental limitations and is based on all relevant evidence in the claimant's record." *Id.* at 461-62.

The ALJ has a duty to fully and fairly develop the facts. *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). The opinions, diagnoses, and medical evidence of a treating physician should be given considerable weight in determining disability. *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990). However, the ALJ does not defer or give any specific evidentiary weight to any medical opinion or prior administrative medical finding. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). In determining what weight to give each medical opinion or prior administrative medical finding, the ALJ considers several factors, including consistency and supportability. *Id.* The ALJ is not required to adopt any prior administrative medical findings, but must consider that evidence. *Id.* §§ 404.1513a(b)(1), 416.913a(b)(1). Further, the ALJ should not substitute his lay opinion for the medical

15

opinion of experts, especially in cases of mental disability.  *Salmond v. Berryhill*, 892 F.3d 812, 818 (5th Cir. 2018).

"It is appropriate for the Court to consider the claimant's daily activities when deciding the claimant's disability status."  *Leggett v. Chater*, 67 F.3d 558, 565 n.12 (5th Cir. 1995).

Here, substantial evidence supports the ALJ's determination that Wells could "understand, carry out and remember detailed but not complex instructions."  (D.E. 10-14 at 10).  Wells relies on Dr. Andrews's evaluation to contend that the ALJ erred in determining that she could understand, carry out, and remember detailed, but not complex, instructions.  However, while Dr. Andrews did indicate that Wells had difficulty remembering instructions, and had more difficulty with complex instructions, he also indicated that Wells had only a mild limitation in her ability to understand and remember both simple and complex instructions, no limitation in her ability to carry out simple instructions, and a mild limitation in her ability to carry out complex instructions.  (D.E. 10-13 at 92).  Accordingly, the ALJ's ultimate RFC determination was not in conflict with Dr. Andrews's evaluation.  Indeed, the ALJ's ultimate RFC determination was arguably more favorable to Wells because it limited her to only detailed, simple instructions, despite Dr. Andrews's conclusion that she had only a mild limitation with regard to complex instructions.

Because the ALJ appropriately incorporated the report by Dr. Andrews into both the RFC determination and the hypothetical asked of the vocational expert, the remainder of Wells's arguments on this issue are misplaced.  Regardless, to the extent that the ALJ

downplayed Dr. Andrews's evaluation to Wells's detriment, the decision shows that she considered the evidence and that substantial evidence supported the RFC determination. The record includes only three sources of evidence regarding any mental limitations caused by Wells's depression and anxiety: (1) the psychological evaluation by Dr. Caldwell-Harper in June 2014; (2) Wells's two function reports in May and August 2014; and (3) Dr. Andrews's evaluation from February 2016.  (D.E. 10-8 at 16-23, 46-53; D.E. 10-10 at 54-57; D.E. 10-13 at 92-93, 96).[2]  Dr. Caldwell-Harper concluded that Wells's thought processes were intact, there was no impairment to her self-perception, her judgment and insight were intact, her remote and recent memory skills were intact, and her concentration skills were intact, while her immediate memory skills were only somewhat intact.  (D.E. 10-10 at 56-57).  Dr. Andrews, as previously discussed, concluded that Wells had no more than a moderate limitation in her ability to make judgments on even complex work-related decisions.  (D.E. 10-13 at 92).  In her function reports, Wells indicated that she could prepare meals, manage money, drive, follow television shows, use a computer, and play board games.  (D.E. 10-8 at 17-20, 47-50).  All of this evidence supports the ALJ's RFC determination and constitutes more than a scintilla of evidence.  *Perez*, 415 F.3d at 461.

---

[2] Dr. Malani and Dr. van Metre also offered opinions regarding Wells's mental limitations.  (D.E. 10-32 at 77, 83).  However, these evaluations were completed in 2019, which was after the end of the period that Wells is seeking disability benefits for.

b. *Whether substantial evidence supported the ALJ's RFC determination where the ALJ concluded that Wells could complete semi-skilled work despite finding that Wells had severe depression and panic disorder*

Next, Wells contends that the ALJ's RFC determination is inconsistent with her own conclusions that Wells suffered from severe depression, severe panic disorder, and had moderate difficulties in concentrating, persisting, or maintaining pace. (D.E. 15 at 10-11). She argues that the finding of a severe mental impairment necessarily means that her ability to understand, remember, and carry out even simple instructions is limited. (*Id.* at 11). Wells asserts that the ALJ's RFC determination does not include any limitations to account for her severe depression and panic disorder, which is problematic because the ALJ determined that she could return to skilled work with mental requirements that exceed her established limitations. (*Id.* at 11-14).

The Commissioner responds that the ALJ's finding of a severe impairment at step two does not require the ALJ to include the impairment in the RFC because the applicable standard is different at each step. (D.E. 18 at 12-13). The Commissioner argues that the RFC determination was based on the medical evidence and appropriately addresses Wells's moderate limitation in concentration, persistence, and pace. (*Id.* at 13). As to whether Wells can return to skilled work in the jobs identified by the vocational expert, the Commissioner notes that Wells did not raise this issue at the administrative hearing. (*Id.* at 14). Regardless, the Commissioner argues that a vocational expert is able to provide an individualized assessment of a claimant's ability to perform certain jobs, and that Wells would still be able to perform the jobs identified despite her mental limitations. (*Id.* at 15-16).

18

The second step of the sequential analysis requires that the factfinder decide whether the claimant's impairment is "severe," irrespective of age, education and work experience. *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992). If the claimant does not have a severe impairment at step two, the Commissioner will typically deny the claim without consideration of the remaining steps. *Id.* An impairment can only be considered as not severe if it is so slight that it would not be expected to interfere with the individual's ability to work. *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985).

RFC, which is determined between the third and fourth steps, is the most a claimant can do despite their limitations. 20 C.F.R. § 404.1545(a). When assessing a claimant's RFC, the ALJ must consider all relevant medical and other evidence, including statements by the claimant and their family members regarding the limitations that result from their symptoms. 20 C.F.R. § 416.945(a)(3). When evaluating a claimant's mental RFC, the ALJ considers factors "such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting." *Id.* § 416.945(c).

Semi-skilled work requires some skills, but does not require doing more complex work duties. 20 C.F.R. § 404.1568(b). However, such jobs "may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work." *Id.*

19

Here, the ALJ applied the proper legal standard during the five-step evaluation process. Wells's argument conflates the second step of the sequential evaluation with the RFC determination. At the second step, the ALJ is required to determine that a claimant has a "severe" impairment. *Anthony*, 954 F.2d at 293. If the ALJ concludes that a claimant has no severe impairment, then that would typically result in a finding that the claimant was not disabled without further evaluation of the claimant's RFC or any of the other steps. *Id.* However, an impairment must be found to be severe unless it is so slight that it would not be expected to interfere with the individual's ability to work. *Stone*, 752 F.2d at 1101. Thus, the ALJ's finding that a particular impairment is "severe" does not require the finding of any specific limitation during consideration of the later steps because a different standard applies. *See, e.g.,* 20 C.F.R. § 416.945(c). The ALJ's RFC determination accounted for the limitations caused by Wells's mental impairments by including a limitation that Wells could only understand, carry out and remember detailed but not complex instructions. (D.E. 10-16 at 10). Finally, as discussed above, substantial evidence supported the ALJ's RFC determination.

> c. *Whether the ALJ erred by concluding that Wells's work skills were readily transferable and that the three jobs identified by the vocational expert would require little vocational adjustment*

Finally, Wells asserts that, due to her advanced age, the ALJ was required to make a finding that there would be very little, if any, vocational adjustment between her prior work and the potential new occupations identified by the vocational expert. (D.E. 15 at 14-16). She contends that the three occupations identified by the vocational expert and

20

ALJ do not meet this standard, and instead require significant vocational adjustment. (*Id.* at 16-19).

The Commissioner responds that the ALJ did find that there would be very little, if any, vocational adjustment between Wells's old jobs and the new jobs identified by the vocational expert. (D.E. 18 at 17-18).

The Commissioner carries the burden at step five of the sequential evaluation to show that a claimant who cannot return to previous work is able to perform other work available in the national economy. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). One way the Commissioner can meet this burden is to call a vocational expert to testify about the jobs the claimant can perform. *Perez v. Heckler*, 777 F.2d 298, 301 (5th Cir. 1985).

In order to show that a claimant is able to adjust to other work, the Commissioner must provide evidence about the existence of work in the national economy that the claimant could do given her RFC, age, education, and work experience. 20 C.F.R. § 404.1512(b)(3). In order to be found disabled, a claimant's impairment must prevent her from making an adjustment to any other work. *Id.* § 404.1520(g). "In order to find transferability of skills to skilled sedentary work for individuals who are of advanced age (55 and over), there must be very little, if any, vocational adjustment required in terms of tools, work processes, work settings, or the industry." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.00(f). When the skilled or semi-skilled work that the claimant previously did can be used in other jobs, those skills are considered transferable. 20 C.F.R. § 404.1568(d)(1). If a claimant is 55 years of age or older and has a severe impairment that limits them to no more than sedentary work, then skills are transferable to skilled or semi-skilled work only

if it is so similar to their previous work that they would need to make "very little, if any, vocational adjustment." *Id.* § 404.1568(d)(4).

"[W]here job skills have universal applicability across industry lines, e.g., clerical, professional, administrative, or managerial types of jobs, transferability of skills to industries differing from past work experience can usually be accomplished with very little, if any, vocational adjustment where jobs with similar skills can be identified as being within an individual's RFC." SSR 82-41, 1982 WL 31389 at *6 (S.S.A. 1982). In contrast, for example, a carpenter's skills are unique to a specific work process in the construction industry and would not be transferable without the need for more than minimal vocational adjustment. *Id.*

Here, the ALJ applied the proper legal standard when, at step five, she determined that Wells could adjust to other work with very little vocational adjustment. Because Wells was 55 years of age or older, was limited to no more than sedentary work, and was unable to return to her previous work, the ALJ was required to make a finding that her skills were transferable to other positions that required very little, if any, vocational adjustment. 20 C.F.R. § 404.1568(d)(4). At the hearing, the ALJ specifically asked the vocational expert whether the jobs of claims clerk, diet clerk, and credit card clerk would require "very little if any vocational adjustments." (D.E. 10-15 at 31). The vocational expert stated that the jobs would require very little vocational adjustment from Wells's previous work as an administrative assistant and general salesperson. (*Id.*). The vocational expert stated that Wells could transfer clerical skills such as use of a computer, doing reports, and recording data from her previous jobs. (*Id.* at 30). The ALJ ultimately concluded that Wells would

22

be able to find work in jobs such as the three identified by the vocational expert. (D.E. 10-16 at 22).

To the extent that Wells raises argument based on the specific codes associated with each occupation in the Dictionary of Occupational Titles ("DOT"), that is not determinative of whether the jobs would require very little vocational adjustment. Job skills with universal applicability across industry lines, such as clerical skills, can be transferable with very little, if any, vocational adjustment where jobs that require similar skills are otherwise within an individual's RFC. SSR 82-41, 1982 WL 31389 at *6. The vocational expert testified that the three jobs identified would require very little occupational adjustment because Wells had clerical skills that were transferable, and clerical skills are one of the classes of skills that are considered transferable across industries. Moreover, the specific DOT entries for each new job and Wells's prior experience as an administrative assistant indicate that they all involve clerical skills such as doing reports and recording data. *See* DOT 169.167-014, 205.367-018, 210.382-038, and 245.587-010.

## IV.   RECOMMENDATION

Based on the foregoing, it is respectfully recommended that Wells's motion for summary judgment (D.E. 14) be DENIED, the Commissioner's motion for summary judgment (D.E. 18) be GRANTED, and Wells's cause of action be DISMISSED.

Respectfully submitted on June 10, 2021.

Julie K. Hampton
United States Magistrate Judge

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).

24